# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARK ANDREW SCOTT, as Special Administrator of the Estate of MELISSA MARIE SCOTT, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:08-CV-02058 |
| BAXTER INTERNATIONAL INC., a corporation and BAXTER HEALTHCARE CORPORATION, a corporation, | ) ) ) ) | Judge Robert W. Gettleman |
| Defendants. | ) ) ) | |

## DEFENDANTS BAXTER INTERNATIONAL INC. AND
## BAXTER HEALTHCARE CORPORATION'S RESPONSE TO MOTION TO REMAND

May 13, 2008

This Court need not and should not decide Plaintiff's motion to remand.  Instead, the Court should follow the lead of the Northern District of Georgia, which held last week in a related heparin lawsuit that it would not decide a motion to remand prior to the Judicial Panel on Multidistrict Litigation ruling on a pending motion to consolidate and transfer all related heparin litigation.  Here too, the most sensible course is to await transfer of this action and allow the MDL court to decide all issues of federal jurisdiction at once.

In the event that the Court reaches the merits of Plaintiff's remand motion, it should retain jurisdiction.[1]  The Supreme Court's decision in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing,* 545 U.S. 308 (2005) ("*Grable*") makes clear that Plaintiff need not assert a federal cause of action for federal question jurisdiction to apply.  Here, substantial federal questions are apparent from the face of Plaintiff's complaint – despite Plaintiff's attempt to downplay the role federal law will play in resolving the issues at stake.

Plaintiff asks this Court to find Defendants negligent for purportedly failing to comply with FDA approval and inspection requirements for foreign suppliers.  Plaintiff also challenges Defendants' conduct in the very areas in which Defendants were governed by ***and complied with*** specific FDA requirements:    manufacture; quality control; warnings; importation and procurement of biomedical products; inspection and approval of foreign suppliers; testing; and recall.  Although framed in the language of state tort law, Plaintiff's claims directly challenge the FDA's approval and regulation of heparin and the federal regulatory process governing the approval and sale of prescription drugs.  Accordingly, federal jurisdiction over Plaintiff's claims is proper and Plaintiff's motion to remand should be denied.

---

[1] Plaintiff's counsel (the Nolan Law Group) apparently agrees that the federal courts are an adequate forum, as they filed a related heparin case, *Banks v. Baxter Healthcare Corp.*, No. 1:08-cv-2324, in the District Court for the Northern District of Illinois.

**ARGUMENT**

**I.    This Court Should Not Address Remand Issues, As An MDL Court Can And Should Decide Issues Related To Federal Jurisdiction In One Proceeding.**

As Defendants noted in their removal petition, the allegations in this case substantially overlap with similar ones made in several other lawsuits filed throughout the United States. Plaintiffs in one of the related cases moved the Judicial Panel on Multidistrict Litigation to consolidate these cases into a Multidistrict Litigation (MDL). Other interested parties, including additional plaintiffs and defendants (including Defendants) have now responded – all in favor of consolidation. Moreover, there are now at least twenty heparin-related lawsuits, including five purported class actions, that have been submitted as tag-along cases that should be consolidated as part of the MDL. The JPML is scheduled to hear oral argument on the motion to consolidate and transfer at its bimonthly meeting on May 29, 2008. Accordingly, consolidation and transfer is both likely and imminent. Indeed, due to the pending motion to consolidate, this Court granted Defendants' Motion to Stay except for briefing on this motion.

Plaintiff maintains that this motion should be decided despite the motion to consolidate. (Mot. at 6 n.1) However, there are at least three other heparin cases that have been removed to federal court based, at least in part, on federal question jurisdiction. All federal jurisdictional issues can and should be handled in a single MDL proceeding to facilitate judicial economy and avoid inconsistent rulings – which are precisely the reasons for establishing the MDL. *E.g., Johnson v. AMR Corp.*, Nos. 95 C 7659- to 95 C 7664, 1996 WL 164415, at *4 (N.D. Ill. Apr. 3, 1996) (staying proceedings pending ruling by MDL panel on consolidation despite pending motion to remand and noting that MDL court should decide jurisdictional issues).[2]

---

[2] *See also Aikins v. Microsoft Corp.*, 2000 WL 310391, at *1-2 (E.D. La. Mar. 24, 2000) (granting stay pending ruling by MDL panel despite pending motion to remand); *Gaffney v. Merck & Co.,* 2005 WL 1700772, at *1-2 (W.D. Tenn. July 19, 2005) (same).

In one of the other heparin cases that has been removed to federal court on the basis of federal question jurisdiction, *Fowler v. Hamilton Medical Center*, No. 4:08-cv-0055-HLM (N.D. Ga.), the court has stayed proceedings and will wait to decide a pending remand motion until the JPML decides the motion to consolidate. (Ex. A, 5/7/08 Order, at 8 ("Additionally, the transferee court may well be in a better position to address the other motions that remain pending in this case, ***such as the Joint Motion to Remand***. Under those circumstances, granting a stay will conserve judicial resources.") (emphasis added)) Based on its experience with the JPML, the court noted that consolidation and transfer would occur in the next couple of months, so any prejudice to parties seeking remand would be minimal. (*Id.* at 7) In another heparin case, a court in this District issued a stay and scheduled a status conference after the MDL meets despite a pending motion to remand. (Ex. B, 5/8/08 Order in *Arnold v. Baxter Healthcare Corp.*, No. 1:08-cv-02168 (N.D. Ill.) (Holderman, C. J.)) In short, no other court where a heparin case is pending is poised to decide federal jurisdiction questions prior to action by the JPML.

## II.     Federal Jurisdiction Is Proper In This Case, Which Raises A Host Of Federal Questions Related To Nearly Every Aspect Of The FDA's Regulatory Scheme.

Although Plaintiff's complaint masquerades as an ordinary state-law tort action, it squarely challenges determinations made by the FDA and the adequacy of federal requirements governing the manufacture and sale of prescription drugs. Resolving the allegations in this lawsuit will require a determination that specific aspects of the federal regulatory process governing prescription drugs are insufficient to protect the public health – a determination that clearly involves a substantial question of federal law.

### A.     Federal Jurisdiction Arises Where The Plaintiff's Claim Requires Resolution Of A Substantial Federal Question.

Plaintiff seems to contend that he can avoid federal jurisdiction by fashioning his complaint as a "garden variety wrongful death action," (Mot. ¶ 1); failing to "plead any cause of

3

action established by federal law" (*id.*); and making "only a singular, fleeting reference to the United States Food and Drug Administration" (*id.*).  But the exercise of federal jurisdiction is both appropriate and warranted where the real nature of a plaintiff's claim is federal, irrespective of how the plaintiff has tried to characterize his claim.  *See, e.g., Jones v. Gen. Tire & Rubber Co.*, 541 F.2d 660 (7th Cir. 1976).

The Supreme Court and other federal courts have readily recognized the existence of federal jurisdiction over claims that, while not created by federal law, nonetheless involve substantial questions of federal law necessary to the plaintiff's right to relief.  *See, e.g., City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997); *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 27-28 (1983); *Smith v. Kan. City Title & Trust Co.,* 255 U.S. 180 (1921).  While "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," it is axiomatic that certain cases depend on the resolution of a federal question sufficiently substantial to arise under federal law.  *Merrell Dow Pharms. Inc. v. Thompson,* 478 U.S. 804, 813 (1986) ("*Merrell Dow*"); *see also Ormet Corp. v. Ohio Power Co.,* 98 F.3d 799, 807 (4th Cir. 1996) (same).

In 2005, the Supreme Court reaffirmed the substantial federal question doctrine in *Grable*.  After the IRS seized Grable's real property and sold it to satisfy a federal tax delinquency, Grable brought a quiet title action in state court claiming that record title was invalid because the IRS had failed to properly notify Grable of the seizure.  The defendant removed the case to federal court as presenting a federal question, because the state claim of title depended on the interpretation of the notice statute in the federal tax law.  The Supreme Court granted certiorari to resolve a split within the Courts of Appeals on whether *Merrell Dow* always requires a federal cause of action as a condition for exercising federal-question jurisdiction.

4

The Court held that a federal cause of action was not required – "th[e] Court having recognized for nearly 100 years that in certain cases federal question jurisdiction will lie over state-law claims that implicate significant federal issues."  545 U.S. at 312.  The Court explained:

> The [substantial federal question] doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues . . . .

*Id.*  The Court determined that the meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court since the Government has a strong interest in the "prompt and certain collection of delinquent taxes and the ability of the IRS to satisfy its claims from the property of delinquents requires clear terms of notice."  *Id.* at 315 (citation omitted).  "The Government thus has a direct interest in the availability of a federal forum to vindicate its own administrative action," and the other parties "may find it valuable to come before judges used to federal tax matters."  *Id.*

Pursuant to *Grable*, federal question jurisdiction is proper where a state-law claim necessarily raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.  *Id.* at 321.

### B.     A Complex Federal Regulatory Scheme For Prescription Drugs Is Set Forth In The Food, Drug & Cosmetic Act And Accompanying Regulations.

The Federal Food, Drug, and Cosmetic Act ("FDCA") was enacted by the United States Congress pursuant to the power conferred upon it under the Constitution to regulate interstate commerce.  21 U.S.C. §§ 301 *et seq.*  The Act's overriding purpose as well as its primary objective is the protection of the public health; the Act is designed primarily to protect

consumers from dangerous products. *U.S. v. Bacto-Unidisk*, 394 U.S. 784 (1969); *U.S. v. Undetermined No. of Unlabeled Cases*, 21 F.3d 1026 (10th Cir. 1994); *Gen. Med. Co. v. U.S. Food & Drug Admin.*, 770 F.2d 214 (D.C. Cir. 1985). The Act is designed to protect public health by regulating certain products moving in interstate commerce. *U.S. v. Vital Health Prods., Ltd.*, 786 F. Supp. 761 (E.D. Wis. 1992), *aff'd*, 985 F.2d 563 (7th Cir. 1993). In this regard, the Act's main purpose is to prohibit the movement in interstate commerce of adulterated and misbranded drugs, devices, and cosmetics. *State v. Deputy*, 644 A.2d 411 (Del. Super. Ct. 1994). Furthermore, one of the Act's primary purposes is to ensure the safety of food and drugs before they become available to the public. *Vital Health Prods., Ltd.*, 786 F. Supp. 761.

The FDA approved Baxter's heparin products only after applying the comprehensive standards set forth in the FDCA and its accompanying regulations. The FDA approval process for new drugs is comprehensive. Applicants must submit, among other things, "full reports of investigations which have been made to show whether or not [the] drug is safe for use and whether [the] drug is effective in use." 21 U.S.C. § 355(b)(1). The formal approval process begins with the manufacturer's submission of an Investigational New Drug application ("IND") to conduct clinical trials. 21 C.F.R. § 312.20. Before filing the IND, the applicant must have subjected biologically active agents of the proposed drug to comprehensive animal and human tissue testing. 21 C.F.R. § 312.23(a). The applicant may commence human clinical trials if the FDA does not request more information or seek modifications to the testing protocols. 21 C.F.R. §§ 312.21-23, 312.40(b)(I). During the next stage of the approval process there are three phases of clinical trials. 21 C.F.R. § 312.21(a)(1), (b), & (c). By statute, the studies conducted must be "adequate and well-controlled." 21 U.S.C. § 355(d); *see* 21 C.F.R. § 314.126(b)(1)-(7). In reviewing the studies, the FDA conducts "an assessment of the scientific quality of the clinical

investigations." 21 C.F.R. § 312.22(a). Moreover, the FDA may require additional testing or studies at any stage in the approval process. 21 C.F.R. § 312.4l(a). Throughout, the FDA "monitor[s] the progress of the conduct and evaluation of clinical trials" and is "involved in facilitating their appropriate progress." 21 C.F.R. § 312.87.

After the successful completion of this testing regime, the applicant must submit a New Drug Application ("NDA"). *See* 21 U.S.C. § 355(a)-(d); 21 C.F.R. § 314.50. The NDA catalogues the history of the drug's development and testing. In seeking approval, the applicant must provide "substantial evidence" that the drug is safe and effective. 21 C.F.R. § 314.125(b)(5). This means:

> evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed.

21 U.S.C. § 355(d); *see also* 21 C.F.R. § 314.125(b).

In reviewing the scientific evidence regarding a proposed drug, the FDA is required to "establish panels of experts" consisting of "members who are qualified by training and experience to evaluate the safety and effectiveness of the drugs to be referred to the panel and who, to the extent feasible, possess skill and experience in the development, manufacturer, or utilization of such drugs." 21 U.S.C. § 355(n)(1) & (n)(3)(A). In determining whether a drug should be approved, the "FDA is required to exercise its scientific judgment to determine the kind and quantity of data and information an applicant is required to provide for a particular drug to meet the statutory standards." 21 C.F.R. § 314.l05(c).

Significantly, the FDA is barred from approving a drug if it finds the manufacturing process deficient. The FDA "shall issue an order refusing to approve the application" if, among other things, "the methods used in, and the facilities and controls used for, the manufacture,

processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity." 21 U.S.C. § 355(d). Furthermore, FDA regulations set forth good manufacturing practices with which drug manufacturers must comply. *See, e.g.,* 21 C.F.R. § 211.1 ("regulations in this part contain the minimum current good manufacturing practice for preparation of drug products for administration to humans or animals").

The FDCA specifically defines when a drug is adulterated. Pursuant to 21 U.S.C. § 351, a drug is "adulterated," *inter alia*:

> (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess; or. . . .

> (b) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, except that whenever tests or methods of assay have not been prescribed in such compendium, or such tests or methods of assay as are prescribed are, in the judgment of the Secretary, insufficient for the making of such determination, the Secretary shall bring such fact to the attention of the appropriate body charged with the revision of such compendium, and if such body fails within a reasonable time to prescribe tests or methods of assay which, in the judgment of the Secretary, are sufficient for purposes of this paragraph, then the Secretary shall promulgate regulations prescribing appropriate tests or methods of assay in accordance with which such determination as to strength, quality, or purity shall be made.

The FDCA prohibits the introduction or sale of adulterated drugs into interstate commerce. 21 U.S.C. § 331. Among other things, the FDA has the authority to seize adulterated drugs that are introduced into interstate commerce. 21 U.S.C. § 334.

Even after approving a prescription drug, the FDA continues to evaluate its safety and efficacy. By law, manufacturers must report to the FDA "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related." 21 C.F.R. § 314.80(a).

Prompt report of serious and unexpected adverse drug experiences is required, as is any increase in frequency of a particular adverse event. 21 C.F.R. § 314.80(c)(1).  Moreover, the FDA, after due notice and opportunity for hearing to the applicant, is statutorily required to withdraw approval under specified circumstances.  21 U.S.C. § 355(e); *see also* 21 C.F.R. § 314.150.

The FDCA sets forth requirements for drug imports (including for components of drugs). *See, e.g.,* 21 U.S.C. § 381(a) ("The Secretary of the Treasury shall deliver to the Secretary of Health and Human Services, upon his request, samples of . . . drugs . . . which are being imported or offered for import into the United States . . . . If it appears from the examination of such samples or otherwise that . . . such article is adulterated . . . then such article shall be refused admission . . . .").  The FDCA gives the FDA authority to issue regulations, conduct examinations and investigations, request records of interstate shipments, conduct factory inspections, and so forth.  21 U.S.C. § 371 *et seq.*

The FDCA also closely regulates what information may and may not be disseminated by manufacturers.  *See, e.g.,* 21 U.S.C. § 360aaa.  Provision is made for the dissemination of information regarding drugs "in situations involving, in the opinion of the Secretary, imminent danger to [the] health or gross deception of the consumer."  21 U.S.C. § 375(b).

C.    **Plaintiff's Claims Necessarily Raise Substantial And Disputed Questions Of Federal Law By Asking The Court To Interpret These Federal Requirements And Challenging The Federal Regulatory Scheme For Prescription Drugs.**

Plaintiff asserts two claims against Defendants:  strict liability and negligence.  Plaintiff's strict liability claim charges that Defendants manufactured, distributed and/or sold defective heparin that "contained animal cartilage and other impurities injurious to the human body," that heparin lacked adequate warnings or instructions, and that the heparin was "otherwise defective." (Mot. ¶ 1)  Plaintiff's negligence claim alleges that Defendants negligently:

procure[d] the product from Chinese suppliers, fail[ed] to inspect the facilities and operations of the suppliers, fail[ed] to test the Chinese Heparin product for unsafe and dangerous impurities contained therein, fail[ed] to employ adequate quality control procedures, fail[ed] to timely recall the product which contained impurities that were injurious to the human body and sold and distributed the product without proper adequate warnings or instructions . . . .

(*Id.*)

Plaintiff specifically asserts in his complaint that Defendants were negligent in procuring biomedical products from foreign suppliers "when the facilities and operations of those suppliers had never been inspected or approved by the United States Food and Drug Administration." (Compl. Count II, ¶ 6(a))  Plaintiff's assertion will require the Court to apply federal law to decide what the federal statute and regulations require and whether inspection and approval requirements were met.  This alone is a substantial, disputed federal issue.

Furthermore, Plaintiff's claims directly challenge the adequacy of numerous, specific aspects of the federal regulatory scheme with which Defendants complied, including, *inter alia,* (1) good manufacturing requirements; (2) warning and labeling requirements; (3) requirements for import of pharmaceutical products; (4) definitions and rules related to "adulterated" drugs; (5) testing requirements; (6) new drug approvals; and (7) adverse event report monitoring.

The adequacy of Defendant's compliance with these federal requirements (and, in turn, the adequacy of the requirements themselves) are actually disputed, since Plaintiffs' claims are premised upon the position that they can prevail on state law tort claims despite Defendants' compliance with these aspects of the federal regulatory scheme.  Moreover, these issues are substantial; indeed, they are at the heart of Plaintiff's complaint.

What is more, Plaintiff's claims expressly challenge the FDA's determinations related to heparin, including its approval of heparin and failure to withdraw approval, as well as its decisions on inspection and approval of the Chinese facility that supplied heparin components.

In short, Plaintiff's claims are inextricably intertwined with the comprehensive federal scheme governing prescription drug approval. Because Plaintiff's claims cannot be decided without the judge or jury second-guessing FDA decisions and assessing the adequacy of the statute and regulations under which the FDA acted, those claims raises a substantial federal question.

A federal district court faced a strikingly similar issue, and held that a substantial federal question existed, in *In re Wireless Telephone Radio Frequency Emissions Products Liability Litigation,* 216 F. Supp. 2d 474 (D. Md. 2002). There, plaintiffs alleged that, because wireless telephones emit radio frequency radiation ("RF"), they are unsafe in the absence of headsets. Wireless telephones are regulated by the FCC which, in conjunction with the FDA, determined that headsets were not required to protect consumer safety. Even though plaintiffs' complaints sought relief only under various state-law theories, the court held that a review of those complaints "and the remedy plaintiffs request reveals that the true gravamen of these complaints is to attack the lack of a headset requirement under the federal RF safety rules." *Id.* at 488.

The court reasoned that any court deciding whether to force defendants to provide headsets would necessarily have to evaluate whether the FCC's determination adequately protected the public health:

> ***Any court faced with such a class and requested remedy necessarily must evaluate whether the FCC has been authorized by Congress to act as the final authority on the regulation of RF emissions from wireless phones, and whether the current RF requirements promulgated by the FCC adequately protect the public's health.*** Indeed, the FCC has already considered and rejected a headset requirement. Thus, a state imposed headset rule necessarily invalidates the national standard. ***A suit to invalidate a federal regulation as unreasonable arises under federal law.***

*Id*. at 488-89 (emphasis added; footnote omitted). The court noted that "[w]here the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for

11

uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts." *Id*. at 490 (quoting *Ormet Corp. v. Ohio Power Co.,* 98 F.3d 799, 807 (4th Cir. 1996)).

That reasoning applies with equal force here. Plaintiff seeks a ruling that contradicts the FDA's determinations with respect to approval and sale of heparin. Furthermore, the central premise of Plaintiff's complaint is that the FDCA and accompanying regulations permitted the sale of a prescription drug that was adulterated and thus unreasonably dangerous to consumers. The only way to grant Plaintiff the relief he seeks is to assess whether the FDCA and accompanying regulations adequately protect the public's health – *i.e.*, "to pass judgment on the validity" of these standards. *In re Wireless*, 216 F. Supp. 2d at 491. Where, as here, the relief sought would conflict with a federal standard, a plaintiff's claim arises under federal law.

The cases cited by Plaintiff do not warrant a different result. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677 (2006), which involved whether federal jurisdiction existed over a reimbursement claim arising from settlement of a state lawsuit, bears no factual similarity to the case at hand. In light of the nature of the federal interest at stake and the degree to which it is implicated, this case is far more akin to the circumstances in *Grable*.[3]

*Merrell Dow* addressed whether the need to apply a misbranding provision of the FDCA to resolve one count was sufficient to invoke substantial question jurisdiction over the entire

_____

[3] Post-*Grable* (and *Empire*), courts have found substantial federal question jurisdiction over state law claims in a variety of circumstances. *E.g., Nicodemus v. Union Pac. Corp*., 440 F.3d 1227 (10th Cir. 2006) (landowners' claims for trespass, unjust enrichment, and slander of title hinged on whether use of rights-of-way granted pursuant to federal land-grant statutes exceeded purpose for which they were granted and thus raised disputed issues of federal law); *In re Nat'l Sec. Agency Telecomm. Records Litig.*, 483 F. Supp. 2d 934 (N.D. Cal. 2007) (state-law privacy claims against telephone companies for alleged release of calling records to National Security Agency gave rise to federal question jurisdiction where application of state secrets doctrine presented disputed and substantial question); *Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258 (N.D. Ga. 2007) (removal proper where court had to determine whether gun brokers' sales to investigators violated federal law to decide brokers' negligence and defamation claims); *In re Pharm. Indus. Average Wholesale Price Litig.*, 457 F. Supp. 2d 77, 81 (D. Mass. 2006) (interpretation of "average wholesale price" provision of federal Medicare statute raises substantial federal question).

six-count complaint.  The Court did not address whether federal jurisdiction would exist over a case challenging the adequacy of any FDCA provision, much less myriad specific aspects of the FDCA's regulatory scheme.  Moreover, concerning *Merrell Dow*, the *Grable* court noted

> *Merrell Dow* cannot be read whole as overturning decades of precedent, as it would have done by . . . converting a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one . . . . In the first place, *Merrell Dow* disclaimed the adoption of any bright-line rule, as when the Court reiterated that "in exploring the outer reaches of § 1331, determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system."  478 U.S. at 810. . . .

545 U.S. at 317.[4]

*Bennett v. Southwest Airlines Co.*, 484 F.3d 907 (7th Cir. 2007), rejected the sweeping proposition that all product liability suits involving commercial air travel belong in federal court because federal aviation standards sometimes play a role.  *Id.* at 909.  Critically, plaintiffs in *Bennett* did not challenge the validity of any specific action by a federal agency, and the Seventh Circuit specifically noted that if the validity of the agency's actions were at stake, it would have reached a different result.  *Id.*  The removing defendants in *Bennett* did not point to any particular disputed issue of federal law.  In addition, unlike in this case, the need for uniformity was not of great concern.  *Id.* at 911 ("How flights proceed while airborne, and which safety devices an airframe should carry, may well be subjects on which only one national rule is tolerable. Many other subjects, however, vary from airport to airport.")[5]

---

[4]    Neither *Merrell Dow* nor *Grable* supports Plaintiff's suggestion that the absence of federal right of action coupled with a lack of preemption automatically means that a claim does not arise under federal law.  (Mot. ¶ 4)  Moreover, federal courts are currently split on the scope of preemption by the FDCA, *see, e.g., Colacicco v. Apotex Inc.*, 521 F.3d 253 (3d Cir. 2008) (finding preemption of failure to warn claim); *In re Bextra and Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, No. M:05 1699 CRB, 2006 WL 2374742 (N.D. Cal. Aug. 16, 2006) (same); with the Supreme Court set to clarify the issue in its next term in *Wyeth v. Levine*, an appeal from the Supreme Court of Vermont.  The FDA has set forth its view that the FDCA preempts at least labeling/warning claims.  71 Fed. Reg. 3933-35 (Jan. 28, 2006).

[5]    The district court cases cited by Plaintiff in which federal jurisdiction was found lacking are distinguishable as well.  For instance, *Pennsylvania v. Eli Lilly & Co.*, 511 F. Supp. 2d 576 (E.D. Pa.

**D.    The Federal Courts Can And Should Exercise Jurisdiction In This Case Without Disturbing Any Congressionally Approved Balance Of Federal And State Judicial Responsibilities.**

Key factors for determining whether federal jurisdiction will be imposed include the importance of the federal interest at stake and whether the exercise of federal jurisdiction will result in a flood of new federal cases. *See Grable*, 545 U.S. at 321; *see also Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 806-07 (4th Cir. 1996) (determination "should be informed by a sensitive judgment about whether the existence of federal judicial power is both appropriate and pragmatic . . . where the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest . . . .").

Here, the need for uniformity is compelling, because Plaintiff's lawsuit raises the potential for disparate requirements for the approval, manufacture and sale of prescription drugs, imposed by courts throughout the country, that could both conflict with and undermine the regulatory framework designed to provide a uniform standard for assuring the safety and efficacy of prescription drugs. Indeed, the federal interests at stake, including the need for uniformity, are particularly compelling here given the centrality of the allegations in the complaint that prescription drug components were adulterated in China and imported from foreign facilities that were not properly FDA-inspected and approved. (*See* Compl. Count II, ¶ 6.) The need for standard and uniform federal requirements relating to importation from and inspection of foreign

---

2007); *Hawaii v. Abbott Laboratories, Inc.,* 469 F. Supp. 2d 842 (D. Haw. 2006); and *Utah v. Eli Lilly & Co.*, 509 F. Supp. 2d 1016 (D. Utah 2007), primarily involved Medicaid reimbursement issues. Although two were actions against pharmaceutical companies for improperly promoting off-label uses, FDCA requirements were not as directly and substantially implicated as in this case. Moreover, courts in similar cases **have found** substantial federal question jurisdiction. *E.g., West Virginia v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 233 (E.D.N.Y. 2007) ("the question of the state's obligation to reimburse its insureds for [prescription drug], using [federal] funds . . . presents a substantial and disputed federal issue under Grable"); *In re Zyprexa Prods. Liab. Litig.*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005) (same).

facilities is a critical federal interest. *See S-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 96 (1984) (a higher level of scrutiny is required for state actions restraining foreign commerce because, unlike interstate commerce, the United States must speak with a single voice for effective relations and trade with foreign nations); *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 448 (1979) ("[f]oreign commerce is pre-eminently a matter of national concern"). At bottom, the centrality and sensitivity of these federal issues distinguish this case from product liability actions that only peripherally raise federal issues, including federal standards.

Moreover, the floodgates will not open from the exercise of jurisdiction under the circumstances. Defendants do not seek a ruling that all state law product liability claims that implicate federal standards – no matter how indirectly – are subject to federal jurisdiction. Defendants simply seek a ruling that, pursuant to the sensitive, case-by-case inquiry required by the Supreme Court's decisions, federal jurisdiction is appropriate here given the significant scope and nature of Plaintiff's challenges to federal requirements and determinations.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court refrain from ruling on Plaintiff's motion to remand or, in the alternative, that the Court deny the motion.


This the 13th Day of May, 2008.

Respectfully submitted,


/s/ Leslie M. Smith, P.C.
Leslie M. Smith, P.C., Attorney No. 6196244
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
telephone:   (312) 861-2000
facsimile:    (312) 861-2200

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

Nancy Ann Fowler,
et al.,


      Plaintiffs,

v.                                                    CIVIL ACTION FILE
                              NO. 4:08-CV-0055-HLM

Hamilton Medical Center, Inc.,
et al.,

      Defendants.

<u>ORDER</u>

This case is before the Court on Defendant Baxter

Healthcare Corporation's Motion to Stay Proceedings

Pending Transfer to the Judicial Panel on Multidistrict

Litigation ("Motion to Stay") [11].

## I.    Background

Defendant Baxter Healthcare Corporation ("Defendant

Baxter") has moved to stay all of the proceedings in this

case pending a decision by the Judicial Panel on Multidistrict Litigation ("JPML") on various motions to transfer filed in this case and in related cases. Defendant Baxter argues that pretrial discovery in the cases will overlap, that consolidation in one transferee court is appropriate, and that staying the proceedings in this case will further the interests of judicial economy and efficiency by eliminating unnecessary duplication of litigation. Defendant Baxter further contends that if the Court refuses to stay the proceedings in this case, Defendant Baxter will be placed in the position of having to develop and present similar defenses in separate federal district courts.

The other Defendants in this litigation apparently oppose the Motion to Stay, and instead argue that an Order remanding this case to the Superior Court of Whitfield

County, Georgia, is appropriate.  As of the date of this Order, Plaintiffs have not responded to Defendant Baxter's Motion, and the time for doing so has expired.[1]

## II.   Discussion

28 U.S.C.A. § 1407 permits the transfer of cases pending in different districts that involve common questions of fact to the same district for coordinated or consolidated

---

[1]The Court directs counsel to comply with the provisions of the Local Rules governing reply briefs, amended briefs, and surreply briefs.  Specifically, counsel ordinarily must obtain permission from the Court <u>prior</u> to filing an amended brief or a surreply brief.  The Court will direct the Clerk to strike all future briefs filed by the parties that do not comply with this rule, and will require the parties to re-file those briefs <u>after</u> obtaining permission from the Court to file the briefs.

The Court also refers counsel to the response time requirements set forth in the Local Rules.  Ordinarily, parties must respond to Motions, other than summary judgment motions, within ten business days, plus three days for mailing.  By the Court's calculation, the Georgia Defendants' response to Defendant Baxter's Motion to Stay, and Plaintiffs' response to that Motion, were due on May 6, 2008, not May 1, 2008, as Defendant Baxter asserts.

3

pretrial proceedings.  28 U.S.C.A. § 1407(a).[2]   "A pending

motion before the JPML does not affect the jurisdiction of

the transferor court."  <u>Falgoust v. Microsoft Corp.</u>, No.

CIV.A. 00-0779, 2000 WL 462919, at *1 (E.D. La. Apr. 19,

2000).[3]

---

[2]28 U.S.C.A. § 1407(a) provides:

When civil actions involving one or more common
questions of fact are pending in different districts, such
actions may be transferred to any district for coordinated
or consolidated pretrial proceedings.  Such transfers
shall be made by the judicial panel on multidistrict
litigation authorized by this section upon its
determination that transfers for such proceedings will be
for the convenience of parties and witnesses and will
promote the just and efficient conduct of such actions.
Each action so transferred shall be remanded by the
panel at or before the conclusion of such pretrial
proceedings to the district from which it was transferred
unless it shall have been previously terminated:
Provided, however, That the panel may separate any
claim, cross-claim, counter-claim, or third-party claim
and remand any of such claims before the remainder of
the action is remanded.

28 U.S.C.A. § 1407(a).

[3]Indeed, Rule 1.5 of the Rules of Procedure of the JPML

4

A court, however, has "inherent power to 'control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" Id. (quoting Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)). Consequently, the Court has discretion to grant a stay of proceedings in this case pending the JPML's decision on the pending motions to transfer. McCrary v.

_____

states:

> The pendency of a motion, order to show cause, conditional transfer order or conditional remand order before the Panel concerning transfer or remand of an action pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court. A transfer or remand pursuant to 28 U.S.C. § 1407 shall be effective when the transfer or remand order is filed in the office of the clerk of the district court of the transferee district.

J.P.M.L. R. 1.5.

5

Bayer Corp., No. CIV.A. 02-642, 2002 WL 1467691, at *1 (E.D. La. July 3, 2002).   Indeed, courts frequently grant stays pending transfer decisions by the JPML to avoid duplicative efforts and to promote judicial economy.   Smith v. Mail Boxes, Etc. USA, Inc., 191 F. Supp. 2d 1155, 1157 (E.D. Cal. 2002) (collecting cases); Tench v. Jackson Nat'l Life Ins. Co., No. 99 C 5182, 1999 WL 1044923, at *1 (N.D. Ill. Nov. 12, 1999).   "When considering a motion to stay, the district court should consider three factors: (1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation if the cases are in fact consolidated." Rivers v. Walt Disney Co., 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).

For the following reasons, the Court finds that staying this action pending the JPML's decision on the motions to transfer is appropriate. First, the JPML has scheduled a hearing on the motions to transfer for May 29, 2008, and, based on the Court's own experience with the JPML, the JPML likely will rule on the pending motions to transfer within the next two to three months. Plaintiffs and the remaining Defendants will suffer little, if any, prejudice from such a short stay.

Second, Defendant Baxter will suffer prejudice and hardship if the Court does not grant a stay in this action. If the Court does not grant a stay, Defendant Baxter will be required to develop and to present similar defenses in several district courts, and will have to engage in duplicate briefing of motions and potentially duplicative discovery.

7

Third, staying the proceedings in this case will promote judicial economy and efficiency.  If the JPML ultimately transfers this case to another district court, the Court will have needlessly expended its energies and resources to familiarize itself with this case.  <u>Rivers</u>, 980 F. Supp. at 1360.  Further, any efforts that this Court might make with respect to case management and discovery "will most likely have to be replicated by the judge [who] is assigned to handle the consolidated litigation if the [JPML] does not consolidate the [Heparin] cases in this Court."  <u>Id.</u> at 1361.  Additionally, the transferee court may well be in a better position to address the other motions that remain pending in this case, such as the Joint Motion to Remand.  Under those circumstances, granting a stay will conserve judicial resources.

For the above reasons, the Court finds that staying the proceedings in this case pending the JPML's decisions on the pending motions to transfer, is appropriate. The Court therefore grants Defendant Baxter's Motion to Stay.

## III.  Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant Baxter Healthcare Corporation's Motion to Stay Proceedings Pending Transfer to the Judicial Panel on Multidistrict Litigation [11], and **STAYS** the proceedings in this case pending the JPML's decision on the pending motions to transfer.  The Court **DEFERS** ruling on all of the other pending Motions in this case pending a decision by the JPML concerning the Motion to Transfer, including: (1) the Motion to Dismiss filed by Defendants Hamilton Health Care System, Inc. and Hamilton Medical Center, Inc. [3]; (2) the

9

Motion to Dismiss filed by Defendants Maxwell and N.W.

Georgia Hematology and Oncology, P.C. [5]; (3) Plaintiffs'

Motion Requesting the Court to Toll Time for the Filing by

Plaintiffs of a Medical Malpractice Affidavit [8]; (4) the Joint

Motion to Remand to State Court [12]; and (5) Plaintiffs'

Motion to Dismiss John C. Church and Dalton Imaging

Center [14].

IT IS SO ORDERED, this the 7th day of May, 2008.

_____
UNITED STATES DISTRICT JUDGE

AO 72A

(Rev.8/82)

# EXHIBIT B

Case 1:08-cv-02168   Document 59-3   Filed 05/08/2008   Page 12 of 12

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.1.3
### Eastern Division

Patrick Arnold, et al.

Plaintiff,

v.                                                  Case No.: 1:08−cv−02168
                                                    Honorable James F. Holderman

Baxter Healthcare Corporation

Defendant.

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, May 8, 2008:

     MINUTE entry before Judge Honorable James F. Holderman: Defendant Baxter Healthcare Corporation's motion to stay of proceedings pending transfer to the Judicial Panel on Multidistrict Litigation [6] and Plaintiffs Patrick Arnold, Elizabeth Arnold's motion to remand [15] are continued to 6/10/2008 at 9:00 AM. Status hearing set for 6/20/2008 at 9:00 AM. Mailed notice (am)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.